NO.
12-06-00055-CV

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

                                                

TYLER, TEXAS

 

§          APPEAL
FROM THE          

THE STATE OF TEXAS

FOR THE BEST INTEREST          §          COUNTY
COURT AT LAW OF

AND PROTECTION OF
J.L.G.

§          CHEROKEE
COUNTY, TEXAS

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



MEMORANDUM OPINION








            Appellant
J.L.G. appeals from an order for temporary inpatient mental health services and
an order to administer psychoactive medications.  In two issues, J.L.G. asserts the evidence is
legally and factually insufficient to support the commitment order and that the
order to administer psychoactive medications is invalid.  We affirm.

 

Background








            On
February 13, 2006, Dr. C.B. Cuellar signed an application for an order to
administer psychoactive medication to J.L.G. 
Cuellar stated that J.L.G. had been diagnosed with schizophreniform
disorder and requested the trial court to compel J.L.G. to take four
psychoactive medications: an antidepressant, an anxoilytic/sedative/hypnotic,
an antipsychotic, and a mood stabilizer. 
Cuellar  stated that J.L.G.
refused to take the medications voluntarily and that, in his opinion, J.L.G.
lacked the capacity to make a decision regarding administration of psychoactive
medications because he exhibited marked delusional denial of his illness.  Cuellar concluded that these medications were
the proper course of treatment for J.L.G. and that, if he were treated with the
medications, his prognosis was better with a good probability of
improving.  However, Cuellar believed
that, if J.L.G. were not administered the medications, his mental health would
deteriorate further, with violence and harm to himself and others.  Cuellar considered other medical alternatives
to psychoactive medication, but determined that those alternatives would not be
as effective. Moreover, Cuellar believed the benefits of the psychoactive
medications outweighed the risks in relation to present medical treatment and
J.L.G.’s best interest. 

            On
February 14, 2006, an application for court ordered temporary mental health
services was filed requesting the court to commit J.L.G. to the Rusk State
Hospital (the “Hospital”) for a period not to exceed ninety days.  At the time the application was filed, J.L.G.
was a patient at the Hospital.  The
application was supported by two physician’s certificates of medical
examination for mental illness.  The
first certificate stated that, on February 13, 2006, Cuellar evaluated and
examined J.L.G. and diagnosed him with schizophreniform disorder.  According to Cuellar, J.L.G. was mentally ill
and was likely to cause serious harm to himself or others.  As the basis for his opinion, Cuellar stated
that J.L.G. denied his illness and admitted hating his father.  Cuellar reported that J.L.G. was paranoid and
threatened suicide and harm to family members. 
Cuellar was further of the opinion that J.L.G. presented a substantial
risk of serious harm to himself or others if not immediately restrained,
demonstrated by his behavior or by evidence of severe emotional distress and
deterioration in his mental condition to the extent that he could not remain at
liberty.  As the basis for this opinion,
Cuellar stated that J.L.G. denied his illness, admitted hating his father, was
paranoid and very angry, and threatened suicide and harm to family members. 

            On
February 14, 2006, Dr. Jon A. Guidry evaluated and examined J.L.G. and
diagnosed him with schizophreniform disorder or bipolar disorder manic.  Guidry noted that J.L.G. refused treatment
and refused to allow him to talk with J.L.G.’s parents.  According to Guidry, J.L.G. was mentally ill
and was likely to cause serious harm to others. 
As the basis for his opinion, Guidry stated that J.L.G. denied traveling
recently, contrary to his records. 
According to Guidry, J.L.G. stated he had been hospitalized in
Palestine.  Further, Guidry reported that
J.L.G. denied allegations that he threatened to kill his father when he was
discharged from the psychiatric hospital in Palestine. Guidry was of the
opinion that J.L.G. presented a substantial risk of serious harm to himself or
others if not immediately restrained, demonstrated by his behavior.  As the basis for this opinion, Guidry reported
that J.L.G. denied allegations that he threatened homicide or suicide, but
stated that “they are bad people.” 
According to Guidry, J.L.G. exhibited paranoia, stating that his family
was trying to do something bad to him, and refused to allow Guidry to talk with
his parents. 

            The
hearing on the application for court ordered temporary mental health services
was held on February 21, 2006.  After a
hearing, the trial court found, by clear and convincing evidence, that J.L.G.
was mentally ill and was likely to cause serious harm to himself and
others.  On February 21, the trial court
entered an order for temporary inpatient mental health services, committing
J.L.G. to the Hospital for a period not to exceed ninety days.  After ordering J.L.G. committed to the
Hospital, the trial court heard the application for an order to administer
psychoactive medication.  The trial court
found, by clear and convincing evidence, that treatment with the proposed
medication was in J.L.G.’s best interest and that he lacked the capacity to
make a decision regarding administration of the medication.  The trial court authorized the Texas
Department of Mental Health and Mental Retardation (the “Department”) to
administer to J.L.G. psychoactive medications, including antidepressants,
antipsychotics, mood stabilizers, and anxiolytics/sedatives/hypnotics.  This appeal followed. 

 

Sufficiency
of the Evidence

            In
his first and second issues, J.L.G. argues that the evidence is neither legally
nor factually sufficient to support the order of commitment and that the order
to administer psychoactive medications is invalid.

Standard of Review

            In
a legal sufficiency review where the burden of proof is clear and convincing
evidence, we must look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a
firm belief or conviction that its findings were true.  In re J.F.C., 96 S.W.3d 256,
266 (Tex. 2002).  We must assume that the
fact finder settled disputed facts in favor of its finding if a reasonable fact
finder could do so and disregard all evidence that a reasonable fact finder
could have disbelieved or found incredible. 
Id.  This does not
mean that we are required to ignore all evidence not supporting the finding because
that might bias a clear and convincing analysis.  Id. 

            The
appropriate standard for reviewing a factual sufficiency challenge is whether
the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner’s allegations.  In re C.H., 89 S.W.3d 17, 25
(Tex. 2002).  In determining whether the
fact finder has met this standard, we consider all the evidence in the record,
both that in support of and contrary to the trial court’s findings.  Id. at 27-29.  Further, we must consider whether disputed
evidence is such that a reasonable fact finder could not have reconciled that
disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 266.  If the disputed evidence is so significant
that a fact finder could not reasonably have formed a firm belief or
conviction, then the evidence is factually insufficient.  Id.  

Involuntary Commitment Order

            The
trial judge may order a proposed patient to receive court ordered temporary
inpatient mental health services if the judge or jury finds, from clear and
convincing evidence, that the proposed patient is mentally ill and, as a result
of the mental illness, he is likely to cause serious harm to himself, is likely
to cause serious harm to others, or is (i) suffering severe and abnormal
mental, emotional, or physical distress, (ii) experiencing substantial mental
or physical deterioration of his ability to function independently, which is
exhibited by his inability, except for reasons of indigence, to provide for his
basic needs, including food, clothing, health, or safety, and (iii) unable to
make a rational and informed decision as to whether or not to submit to
treatment.  Tex. Health & Safety Code Ann. § 574.034(a) (Vernon
2003). 

            To
be clear and convincing under this statute, the evidence must include expert
testimony and, unless waived, evidence of a recent overt act or a continuing
pattern of behavior that tends to confirm either the likelihood of serious harm
to the proposed patient or others or the proposed patient’s distress and the
deterioration of his ability to function. Tex.
Health & Safety Code Ann. § 574.034(d) (Vernon 2003).  Clear and convincing evidence means the
measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.  State v. Addington,
588 S.W.2d 569, 570 (Tex. 1979).  The
statutory requirements for an involuntary commitment are strict because it is a
drastic measure.  In re C.O.,
65 S.W.3d 175, 182 (Tex. App.–Tyler 2001, no pet.). 

            The
State provided expert testimony from Cuellar and Guidry who examined J.L.G. and
diagnosed him with schizophreniform disorder. 
However, expert testimony confirming mental illness, standing alone, will
not support an involuntary commitment.  T.G.
v. State, 7 S.W.3d 248, 252 (Tex. App.–Dallas 1999, no pet.).  Both doctors provided evidence showing that
J.L.G. was mentally ill.  Cuellar
reported that J.L.G. denied his illness, admitted hating his father, and was
paranoid and very angry.  Guidry stated
that J.L.G. refused treatment, denied recent travel, contrary to his records,
and was paranoid, stating that his family was trying to do something bad to
him.  At the hearing, Guidry testified
that J.L.G. continued to self-converse and show some irritability.  Guidry stated that his observations at the
Hospital along with J.L.G.’s paranoia and lack of insight suggested that J.L.G.
remained psychotic and paranoid. 
Evidence of continuing delusional or paranoid behavior merely reflects
that an individual is mentally ill and in need of hospitalization, but does not
provide the continuing pattern of behavior necessary to support a
commitment.  See In re C.O.,
65 S.W.3d at 182; Broussard v. State, 827 S.W.2d 619, 622 (Tex.
App.–Corpus Christi 1992, no writ). 

            An
expert opinion recommending commitment must be supported by the factual bases
on which it is grounded and not simply recite the statutory criteria.  See J.M. v. State, 178 S.W.3d
185, 193 (Tex. App.–Houston [1st Dist.] 2005, no pet.).  What is necessary is the expert’s description
of the patient’s specific behaviors on which his or her opinion is based.  See id.  We must examine the record to determine where
there is clear and convincing evidence showing an overt act or a continuing
pattern of behavior that tended to confirm the likelihood of serious harm to
others or his distress and the deterioration of his ability to function.  See Tex.
Health & Safety Code Ann. § 574.034(d). 

            Regarding
J.L.G.’s threats or threatening actions, Cuellar reported that J.L.G.
threatened suicide and harm to family members. 
Guidry noted that J.L.G. denied allegations that he threatened to kill
his father, but refused to let Guidry speak with his father.  At the hearing, Guidry testified that  J.L.G. believed that his family was trying to
harm him even though the family showed no malevolence and J.L.G. could not
clarify why his family was bad or evil or would attempt to do something bad to
him.  Guidry was concerned that J.L.G.’s
condition would deteriorate to the point where he could be dangerous to
others.  Guidry stated that J.L.G.’s
further deterioration could lead to rehospitalization or jail.  Although J.L.G. denied  allegations that he threatened himself or
others, Guidry stated that he was worried about J.L.G.’s family’s safety.  Guidry admitted that J.L.G. had not made any
recent overt act of harm to himself, but stated that, according to earlier
testimony, he had pushed a hand out in front of him against his half sister,
Sandra Isget.

            Jimmy
Lee Griffin, J.L.G.’s father, testified that J.L.G.’s behavior had changed
recently.  He stated that J.L.G. made
threats to him and Griffin’s parents and stated that he was going to kill
himself.  J.L.G. told Griffin that he
believed his whole family would kill him “if they thought they could do it and
get away with it.”  According to Griffin,
J.L.G. said that there was nothing wrong with him, that he was tired of his “whole
family” hating him, and that he was going to do something about it.  Griffin stated that J.L.G. went from
conversing with him to hating him and Griffin’s parents and stating that “there
was no telling what he might do.”  About
a month ago, J.L.G. told Griffin that he “may take care of himself.”  Griffin believed that J.L.G.’s statements
indicated that he was going to harm himself, Griffin, or Griffin’s parents. 

            Isget
testified that J.L.G. made threats on his life to her.  J.L.G. stated to Isget that he would not be
in her wedding because he would not be “here then.”  J.L.G. told her that he did not want to be “here,”
and that he was tired of being “here.” 
Isget believed J.L.G. was in danger. 
Isget alleged that J.L.G. physically pushed her arm away when she
reached to touch him in the hallway before the hearing.  Regarding the incident with Isget, J.L.G.
stated that Isget grabbed him and was getting in his way, so he shoved her hand
away and walked off.

            Regarding
J.L.G.’s deterioration of his ability to function, Griffin also testified that
J.L.G. began disappearing, failed to show up for one of their regular Friday
night dinners, and failed to show up at work, all without notice.  Griffin noted that, prior to this incident,
J.L.G. had not missed work in three years. 
Moreover, J.L.G. became angry and confrontational when Griffin attempted
to check up on him.  Directly afterwards,
J.L.G. disappeared for three days. 
J.L.G. had not been paying his rent regularly or his utilities at all in
four months.  Although J.L.G. believed
that his family disowned him, Griffin denied the allegation.  About a week before J.L.G.’s hospitalization,
Griffin and J.L.G. had dinner.  During
dinner, Griffin stated that J.L.G. stared off into space about fifteen or
twenty times during the meal, a tendency that had started a few months
ago.  During those times, Griffin stated,
he could not get J.L.G.’s attention. 
According to Griffin, J.L.G. was fascinated with movie stars.  At one point, J.L.G. wanted to discuss movie
actors and directors.  Instead of
responding, Griffin asked J.L.G. to consider visiting a doctor.  According to Griffin, J.L.G. reacted
violently, yelled at Griffin, cursed, ran from the restaurant, and hid in his
vehicle. 

            Isget
noted that J.L.G. had delusions regarding a relationship with a girl and that
his perception of reality was “skewed.” 
He was obsessed with celebrities and religion.  Isget testified that J.L.G. was paranoid
about financial institutions and that, after withdrawing his money from the
bank, he failed to pay for essentials, such as housing and food.  J.L.G. testified that his family disowned him
and no longer cared about him.  He
equated not caring about him with disowning him.  He denied that Griffin was his father.  In J.L.G.’s opinion, his family disowned him
because they were not good people and he was. 
J.L.G. admitted that he was a movie buff and that, just because he
wanted to talk about movies, Griffin thought it was “weird” and
uninteresting.  J.L.G. denied becoming
angry and storming out during dinner, although he admitted not finishing the
meal.  He believed that his father had
dinner with him in order to put him in the Hospital and to do something bad to
him.  According to J.L.G., his father
lied and made up “stuff” to put him in the Hospital.

            We
consider J.L.G.’s threats to his family and alleged threatening actions, his
delusions regarding his family and his view that his family was going to do
something bad to him, his deteriorating ability or inclination to take care of
his basic needs, and his inability to recognize his  mental illness to be a continuing pattern of
behavior that tended to confirm the likelihood of serious harm to himself or
others.  See  Tex.
Health & Safety Code Ann. § 574.034(d).  Viewing all the evidence in the light most
favorable to the findings, we conclude a reasonable trier of fact could have
formed a firm belief or conviction that J.L.G. was likely to cause serious harm
to himself or others. See Tex.
Health & Safety Code Ann. § 574.034(a), (d); In re J.F.C.,
96 S.W.3d at 266. Therefore, the evidence is legally sufficient to support the
trial court’s order.  See In re
J.F.C., 96 S.W.3d at 266. 

            Having
determined that the evidence is legally sufficient to support the order, we
address factual sufficiency and consider all of the evidence, both that in
support of and contrary to the trial court’s findings.  See In re C.H., 89 S.W.3d at
27-29.  Griffin admitted that J.L.G.
never stated he was going to kill him nor had he committed any overt act in an
attempt to harm himself or others. Isget admitted that J.L.G.’s comments to her
could have meant that he was not going to be a part of her wedding, that he did
not like her, or that he was moving.  She
admitted that J.L.G. never told her he was going to kill himself or hurt her or
others.  Isget also denied that J.L.G.
assaulted her. Guidry admitted that his working chart did not document an
assault on another patient or the staff at the Hospital.  Guidry also stated that J.L.G. never said he
would harm himself or others. Griffin admitted that J.L.G. was “semi” able to
shop for food and clothing. 

            J.L.G.
denied ever stating that he wanted to harm himself or others and denied wanting
to do so.  He also denied stating that he
would harm his parents or grandparents. 
He denied any assaultive behavior at the Hospital or having a criminal
record.  J.L.G. also denied being a
paranoid schizophrenic and stated that Guidry misdiagnosed him, could not prove
his illness, and was making it up. 
Although J.L.G. denied having any interaction with his family, he
admitted that he had a birthday party with them before Christmas.  He admitted that his family never told him
that they disowned him or that they did not like or care about him.  J.L.G. stated that he paid rent and had a job
for three years, missing only one day of work. 
He denied telling Isget that he wanted to harm himself and stated that
he meant he was moving.

            The
trial court was entitled to disbelieve J.L.G. and disregard the evidence
contrary to the State’s position.  See
id.  Based upon our
review of the record as a whole, we conclude that, although there is some
disputed evidence, this evidence is not so significant that a reasonable trier
of fact could not have reconciled this evidence in favor of its finding and
formed a firm belief or conviction that J.L.G. was likely to cause serious harm
to himself or others.  See Tex. Health & Safety Code Ann. § 574.034(a)(d);
In re J.F.C., 96 S.W.3d at 266. 
Therefore, the evidence is factually sufficient to support the trial
court’s order.  See In re J.F.C.,
96 S.W.3d at 266.  Accordingly, we
conclude that the trial court met the obligations imposed by Section 574.034 of
the Texas Health and Safety Code and overrule J.L.G.’s first issue.

Order to Administer Psychoactive
Medication

            A
trial court may issue an order authorizing the administration of one or more
classes of psychoactive medications to a patient who is under a court order to
receive inpatient mental health services. 
Tex. Health & Safety Code Ann.
§ 574.106(a) (Vernon Supp. 2006).  The
court may issue an order if it finds, by clear and convincing evidence that (1)
the patient lacks the capacity to make a decision regarding the administration
of the proposed medication and (2) treatment with the proposed medication is in
the best interest of the patient.  Id.
§ 574.106(a-1).  “Capacity” means a
patient’s ability to (1) understand the nature and consequence of a proposed
treatment, including the benefits, risks, and alternatives to the proposed
treatment, and (2) make a decision whether to undergo the proposed
treatment.  Tex. Health & Safety Code Ann. § 574.101(1) (Vernon
2003). In making its findings, the trial court shall consider (1) the patient’s
expressed preferences regarding treatment with psychoactive medication, (2) the
patient’s religious beliefs, (3) the risks and benefits, from the perspective
of the patient, of taking psychoactive medication, (4) the consequences to the
patient if the psychoactive medication is not administered, (5) the prognosis
for the patient if the patient is treated with psychoactive medication, and (6)
alternatives, less intrusive treatments. See Tex. Health & Safety Code Ann. § 574.106(b) (Vernon Supp.
2006). 

            In
his brief, J.L.G. contends that the order authorizing the administration of
psychoactive medications is invalid because the order of commitment is
invalid.  Because we have concluded that
the order for temporary inpatient mental health services was valid, we must
determine whether the evidence is legally and factually sufficient to support a
finding that J.L.G. lacked the capacity to make a decision regarding
administration of psychoactive medication and that it was in his best
interest.  Cuellar and Guidry believed that
J.L.G. lacked the capacity to make a decision regarding administration of
psychoactive medications.  Cuellar based
his opinion on J.L.G.’s marked delusional denial of his illness.  Cuellar believed that if J.L.G. were not
administered these medications, his mental health would deteriorate further,
resulting in violence and harm to himself and others.  Guidry based his opinion on J.L.G.’s lack of
insight into his illness, denial of his illness, and statements that he did not
need medication because he was not mentally ill.  Guidry stated that, if J.L.G. were not
administered these medications, his condition would deteriorate and his
psychosis would worsen. 

            Both
doctors stated that there were no less intrusive means of achieving the same
results other than psychoactive medications. 
Moreover, both doctors stated that the benefits of the psychoactive
medications outweighed the risks and that these medications were in J.L.G.’s
best interest.  J.L.G. discussed these
medications with Guidry, but refused to take them, stating that he did not need
them.  Guidry stated that, without
medication, it was unlikely J.L.G. would improve.  Guidry testified that the longer J.L.G. was
in a psychotic episode without medication, the more damage he was doing.  Considering all the evidence in the light
most favorable to the findings, we conclude a reasonable trier of fact could
have formed a firm belief or conviction that J.L.G. lacked the capacity to make
a decision regarding administration of the proposed medications and that
treatment with the proposed medications was in his best interest.  See Tex.
Health & Safety Code Ann. § 574.106(a-1); In re J.F.C.,
96 S.W.3d at 266.  Therefore, the
evidence is legally sufficient to support the trial court’s order.  See In re J.F.C., 96 S.W.3d at
266. 

            Having
determined that the evidence is legally sufficient to support the finding, we
address factual sufficiency and consider all of the evidence, both that in
support of and contrary to the trial court’s findings.  See In re C.H., 89 S.W.3d at
27-29.  Guidry admitted that he and
J.L.G. discussed taking these psychoative medications and their possible side
effects.  J.L.G. testified that he did
not want these medications and believed that they “mess[ed] with the serotonin
and the transmitters in the brain.”  He
denied being depressed, psychotic, or schizophrenic, and said to “prove it.”  J.L.G. wanted vitamins and exercise.  The trial court was entitled to disbelieve
J.L.G. and disregard the evidence contrary to the State’s position.  See id.  Further, the trial court was not required to
defer to J.L.G.’s preferences and beliefs, but must have considered them.  See Tex.
Health & Safety Code Ann. § 574.106(b). 

            Because
J.L.G. presented evidence to the trial court of his preference not to take
psychoactive medications, it is presumed that the trial court gave his
preferences and beliefs due consideration. Based upon our review of the record
as a whole, we conclude that, although there is some disputed evidence, this
evidence is not so significant that a reasonable trier of fact could not have
reconciled this evidence in favor of its finding and formed a firm belief or
conviction that J.L.G. lacked the capacity to make a decision regarding
administration of the proposed medications, and that treatment with the
proposed medications was in his best interest. 
See  Tex. Health & Safety Code Ann. § 574.106(a-1),
(b); In re J.F.C., 96 S.W.3d at 266.  Therefore, the evidence is factually
sufficient to support the trial court’s order. 
See In re J.F.C., 96 S.W.3d at 266.  Accordingly, we conclude that the trial court
met the obligations imposed by Section 574.106 of the Texas Health and Safety
Code and overrule J.L.G.’s second issue.

 

Disposition

            The
judgment of the trial court is affirmed.

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

Opinion delivered August 25, 2006.

Panel
consisted of Worthen, C.J. and Griffith, J.

 

(PUBLISH)